JENNER & BLOCK LLP
Andrew J. Thomas (SBN 159533)
ajthomas@jenner.com
Alice S. Kim (SBN 317479)
akim@jenner.com
633 West Fifth Street, Suite 3600
Los Angeles, CA 90071
Telephone: (213) 239-5100
Facsimile: (213) 239-5199

Attorneys for Plaintiff
WARNER BROS. ENTERTAINMENT INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARNER BROS. ENTERTAINMENT INC., a Delaware corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>RANDOM TUESDAY, INC., a Connecticut corporation, dba HOGWARTS RUNNING CLUB, CHILTON RUNNING CLUB, and POTTERHEAD RUNNING CLUB; BRIAN BIGGS, an individual; and DAWN BIGGS, an individual,<br><br>        Defendants. | Case No. 20-2416<br><br>**COMPLAINT FOR:**<br><br>**[1] TRADEMARK INFRINGEMENT AND COUNTERFEITING [15 U.S.C. § 1114]**<br><br>**[2] FALSE DESIGNATION OF ORIGIN [15 U.S.C. § 1125]**<br><br>**[3] TRADEMARK DILUTION [15 U.S.C. § 1125]**<br><br>**[4] FALSE ADVERTISING [15 U.S.C. § 1125]**<br><br>**[5] COPYRIGHT INFRINGEMENT [17 U.S.C. § 106]**<br><br>**[6] COMMON LAW UNFAIR COMPETITION (PASSING OFF)**<br><br>**[7] COMMON LAW TRADEMARK INFRINGEMENT**<br><br>**[8] VIOLATION OF CAL. BUS. & PROF. CODE § 17200**<br><br>**[9] VIOLATION OF CAL. BUS. & PROF. CODE § 17500**<br><br>**[10] VIOLATION OF CAL. BUS. & PROF. CODE § 17247**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Warner Bros. Entertainment Inc. ("Warner Bros."), brings this action against Defendants Brian Biggs, Dawn Biggs, and Random Tuesday, Inc., doing business as Hogwarts Running Club, Chilton Running Club, and Potterhead Running Club, for injunctive relief and damages and alleges as follows:

## NATURE OF THE ACTION

1.    This is a lawsuit to remedy Defendants' deliberate, pervasive, and willful infringement and dilution of Warner Bros.' intellectual property rights with respect to the well-known and highly popular *Harry Potter* and *Gilmore Girls* entertainment franchises – both in the branding and promotion of Defendants' businesses and in their sales of unlicensed merchandise bearing Warner Bros.' distinctive marks through their online store.

2.    Since the publication of *Harry Potter and the Sorcerer's Stone* in 1997, the world has been captivated by the fictional magical universe created by author J.K. Rowling.  That universe was brought to visual life by Warner Bros., starting with the first *Harry Potter* film, also titled *Harry Potter and the Sorcerer's Stone*, in 2001, followed thereafter by seven more films tracking the entirety of the book series, and a multitude of related entertainment products, services, and experiences created by Warner Bros., constituting a franchise of enormous breadth and value.

3.    All of the various elements of the *Harry Potter* universe, including its fanciful characters of witches, wizards, and Muggles, magical creatures, spells, potions, and charms, games, treasures, and gadgets, are immensely popular and have come to symbolize not only the literary creations of Ms. Rowling, but also the wide variety of goods and services of Warner Bros. and its *Harry Potter* franchise in the eyes and mind of the public.  These elements have been highlighted not only in the numerous *Harry Potter* books and movies, but also in theme parks, games, merchandise, events, and other products and services marketed over the past two decades.  One particularly well-known element of the *Harry Potter* franchise is the

wondrous Hogwarts School of Witchcraft and Wizardry, where Harry and his famous friends live and attend classes taught by Hogwarts professors, and where many of the key events of the stories take place.  Fans of *Harry Potter* understand and acknowledge the significance of Hogwarts in the *Harry Potter* franchise, and they associate Hogwarts with the goods and services of Warner Bros.

4.     Another of Warner Bros.' entertainment franchises, the television series *Gilmore Girls*, has since 2000 similarly won the hearts of countless fans who follow the quirky escapades of Lorelai Gilmore and her daughter, Rory, in the fictional town of Stars Hollow.  The *Gilmore Girls* characters, locations, symbols, and other elements are immensely popular and have come to symbolize Warner Bros. and its *Gilmore Girls* franchise in the eyes and mind of the public.  The elements of the *Gilmore Girls* series have been highlighted in the numerous *Gilmore Girls* television episodes, games, and merchandise created by Warner Bros. over many years.  One particularly well-known element of the *Gilmore Girls* franchise is the fictional Chilton Preparatory School where Rory and her friends attend school and where many of their adventures take place.  Fans of *Gilmore Girls* understand and acknowledge the significance of Chilton in the franchise, and they associate Chilton with the goods and services of Warner Bros.

5.     Fully aware of these facts, and in a deliberate effort to attract and grow their customer base by trading on the reputation and goodwill associated with Warner Bros.' *Harry Potter* and *Gilmore Girls* franchises, Defendants have created and operated two business units, or divisions, that consist of "virtual running clubs" named and branded with Warner Bros.' intellectual property (collectively, the "Clubs").  One is based on the *Harry Potter* franchise and, until late 2018, was called "Hogwarts Running Club."  In late 2018, Defendants announced their intention to rebrand this running club as "Potterhead Running Club," capitalizing on the name of the central character in the *Harry Potter* entertainment franchise, and in January 2019, Defendants revamped their website to use "Potterhead

Running Club" as the new business name and brand for their *Harry Potter*-themed running club.  Defendants also operate "Chilton Running Club" based on the *Gilmore Girls* television series.  The Clubs cater to their customers' interest in immersing themselves in the *Harry Potter* and *Gilmore Girls* fictional universes by providing their customers with opportunities, for a fee, to participate in themed events and activities and to purchase a variety of merchandise that features Warner Bros.' trademarks and trade dress, or close variations thereof.

6.     Defendants operate a third virtual running club themed around the "Doctor Who" entertainment franchise, confirming that trading on the intellectual property of others is at the core of their business model.  Consistent with this model, Defendants also have launched a virtual running club called Fandom Running Club, which features a "Cult Classics" series of events branded with the intellectual property of third parties.

7.     Without any license or permission from Warner Bros., Defendants operate and market the Clubs in a manner designed to create, and which does create, confusion in the marketplace and which unfairly trades on Warner Bros.' reputation and goodwill.  The Clubs, through their websites and elsewhere, engage in activity and sell infringing merchandise bearing Warner Bros.' protected marks and copyrighted images, including t-shirts, stickers, hairbands, mugs, lip balm, water bottles, and running medals.  This infringing merchandise is similar to that marketed by Warner Bros. and in many cases competes directly with licensed *Harry Potter* and *Gilmore Girls* merchandise.  Defendants are making unauthorized use of Warner Bros.' intellectual property in order to create confusion among consumers regarding the connection, authorization, and affiliation between the Clubs and Warner Bros. and its beloved entertainment franchises.  Defendants' unauthorized uses also dilute Warner Bros.' famous marks.

8.     Defendants' activities have succeeded in confusing consumers, as

evidenced by a complaint Warner Bros. received in August 2019 from a consumer who complained that she was induced to contribute substantial sums of money to Defendants' business because she mistakenly believed the business was approved by Ms. Rowling and "all their material has been approved by WB."  When the consumer raised concerns to Defendants, Defendants reportedly assured her that they had Warner Bros.' "permission for proprietary material" and that they "work daily with the WB legal team."  Defendants also reportedly stated that "what WB doesn't know doesn't hurt anyone" and that they "can do what they want" and "WB has no say in the matter."

9.      Warner Bros. has attempted to resolve its dispute with Defendants through multiple letters, telephone calls, and an in-person meeting, all of which have put Defendants fully on notice of their infringing conduct.  Despite these efforts, Defendants continue to make unauthorized and infringing use of Warner Bros.' intellectual property in their business names and activities, and continue to advertise and sell infringing merchandise on their websites and social media pages in violation of Warner Bros.' rights.  Indeed, while Defendants have long been fully on notice of their infringing conduct, their infringing conduct has only grown more brazen.

**JURISDICTION AND VENUE**

10.      This is a civil action for trademark infringement and trademark counterfeiting in violation of Section 32 of the Lanham Act, 15 U.S.C. §§ 1114, 1117; false designation of origin and false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); false advertising under 15 U.S.C. § 1125(a)(1)(B); copyright infringement under the Copyright Act of the United States, 17 U.S.C. § 101, *et seq.*, and violations of state statutory and common law.

11.      This Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 in that it involves an action

arising under both the federal Lanham Act and the federal Copyright Act.  This Court has jurisdiction over the state law claims alleged herein pursuant to 17 U.S.C. § 1332 because there is complete diversity between Warner Bros. and Defendants.  In the alternative, this Court has supplemental jurisdiction over the state law claims pursuant to 17 U.S.C. § 1367.

12.  This Court has personal jurisdiction over Random Tuesday, Inc., doing business as Hogwarts Running Club and Chilton Running Club, and more recently as Potterhead Running Club, because this action arises out of conduct expressly aimed at and regularly taking place in the State of California.  Among other things, Defendants' websites reach a substantial audience in California, and Defendants' running clubs have a substantial number of members who are located in California and who engage in Defendants' sponsored race activities in California.  Indeed, in 2018, Defendants elevated approximately 283 of their many California members to their Hall of Fame as "Perfect Prefects" – meaning these 283 California members registered for all six of Defendants' virtual running events, as well as their annual Challenge event, "for a total of seven events in a single calendar year," and thereby "distinguished themselves" for "their dedication to the PHRC [Potterhead Running Club]."  In 2019, Defendants elevated approximately 164 of their many California members.

13.  Defendants also have partnered with charitable organizations in California in the regular course of their business, and they have sponsored and organized social gatherings in California among members of the Clubs.  For example, Defendants sponsored the "Ravenclaw 10K" event in San Francisco, California, and promoted the event on their website and Facebook page.  For another example, Defendants also sponsored the "Eternal Glory 4-Miler" event in San Francisco, California, and promoted the event on their website and Facebook page.

14. Defendants also have offered infringing merchandise for sale and shipping to California through their websites, and have sold infringing merchandise to purchasers in California. Warner Bros.' agents in California have purchased and received delivery in California of numerous infringing items from Defendants' online store, including t-shirts, hairbands, water bottles, medallions, stickers, hats, metal hangers, bandanas, lip balm, and socks. The infringing merchandise sold by Defendants is confusingly similar to and in direct competition with authorized merchandise sold by Warner Bros. and its licensees throughout the United States, including in California. Warner Bros. is informed and believes, and on that basis alleges, that a substantial portion of Defendants' revenues are derived from their virtual race activities with California residents and their sales of merchandise to California residents. Through their actions, Defendants have knowingly and deliberately targeted and caused injury to the intellectual property rights of Warner Bros., which Defendants know to be based in California, and they have knowingly and deliberately caused injury to the reputation and goodwill of Warner Bros. among consumers in California.

15. This Court has personal jurisdiction over Brian Biggs. Warner Bros. is informed and believes, and on that basis alleges, that Mr. Biggs, as Founder and Chief Executive Officer of Random Tuesday, Inc., directs and controls the activities of the organization, including its substantial and repeated contacts with the State of California described above. Among other things, Mr. Biggs knowingly directs Random Tuesday, Inc. to offer infringing merchandise for sale and shipping to California through its websites and thereby has deliberately caused injury to the intellectual property rights, reputation, and goodwill of Warner Bros. in California.

16. In addition, in 2018, Mr. Biggs attended San Diego Comic Con ("SDCC") to promote Defendants' running club businesses, including Hogwarts Running Club. SDCC is a convention held in San Diego, California, that is attended by thousands of people every year. Mr. Biggs also attended a "meet-up"

dinner with Random Tuesday, Inc.'s members in connection with SDCC to further promote the running club businesses, including Hogwarts Running Club.  In 2019, Mr. Biggs again attended SDCC to promote the running club businesses, including Potterhead Running Club, and spoke on a SDCC panel.  His participation as a panelist was promoted on Defendants' website and on Facebook.  Mr. Biggs again attended a meet-up event with Random Tuesday, Inc.'s members in connection with SDCC to further promote the running club businesses, including Potterhead Running Club.  On information and belief, Mr. Biggs also attended the 2018 and 2019 Gallifrey One conventions in Los Angeles, California, to promote the running club businesses, including Hogwarts Running Club and Potterhead Running Club, and promoted the events on Random Tuesday, Inc.'s website and Facebook page.  On information and belief, Mr. Biggs also attended the 2019 WhedonCon convention in Los Angeles, California, to promote the running club businesses, including Potterhead Running Club, and promoted the event on Random Tuesday, Inc.'s website and Facebook page.  On information and belief, Mr. Biggs also has used his personal Facebook page to promote the running club businesses, including Potterhead Running Club.

17. This Court has personal jurisdiction over Dawn Biggs.  Warner Bros. is informed and believes, and on that basis alleges, that Ms. Biggs, as Founder and Chief Creative Officer of Random Tuesday, Inc., directs and controls the activities of the organization, including its substantial and repeated contacts with the State of California described above.  Among other things, Ms. Biggs knowingly directs Random Tuesday, Inc. to offer infringing merchandise for sale and shipping to California through its websites and thereby has deliberately caused injury to the intellectual property rights, reputation, and goodwill of Warner Bros. in California.

18. In 2018, Ms. Biggs attended SDCC to promote Defendants' running club businesses, including Hogwarts Running Club, and spoke on a SDCC panel.  Her participation as a panelist was promoted on Defendants' website and on

Facebook.  Ms. Biggs also attended a meet-up dinner with Random Tuesday, Inc.'s members in connection with SDCC to further promote the running club businesses, including Hogwarts Running Club.  In 2019, Ms. Biggs again attended SDCC to promote the running club businesses, including Potterhead Running Club.  Ms. Biggs again attended a meet-up event with Random Tuesday, Inc.'s members in connection with SDCC to further promote the running club businesses, including Potterhead Running Club.  On information and belief, Ms. Biggs also attended the 2018 and 2019 Gallifrey One conventions in Los Angeles, California, to promote the running club businesses, including Hogwarts Running Club and Potterhead Running Club, and promoted the events on Random Tuesday, Inc.'s website and Facebook page.  On information and belief, Ms. Biggs also attended the 2019 WhedonCon convention in Los Angeles, California, to promote the running club businesses, including Potterhead Running Club, and promoted the event on Random Tuesday, Inc.'s website and Facebook page.  Finally, Ms. Biggs has frequently used her personal Twitter account to promote the running club businesses, including Hogwarts Running Club, Potterhead Running Club, and Chilton Running Club.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims have occurred in this district.

## THE PARTIES

20.     Plaintiff Warner Bros. is a Delaware corporation with its principal place of business at 4000 Warner Boulevard, Burbank, California.  Warner Bros. is an internationally-known motion picture and television studio, which produces and distributes motion pictures and television series in the United States and around the world.  Warner Bros. and its affiliates own the exclusive rights to distribute the *Harry Potter* films and *Gilmore Girls* television series in the United States and around the world.  Warner Bros. also has created, distributed, and owns intellectual

property interests (including trademark, copyright, and trade dress) in the *Harry Potter* films and *Gilmore Girls* television series, including the characters, locations, and other elements contained therein.

21.     Warner Bros. is informed and believes, and on that basis alleges, that Defendant Random Tuesday, Inc., doing business as Hogwarts Running Club and Chilton Running Club, and more recently as Potterhead Running Club, is a 501(c)(3) organization, engaged in raising funds for charities, registered to do business in Georgia and Connecticut, with its principal place of business at 2351 Boston Post Road, Suite 205, Guilford, Connecticut.

22.     Warner Bros. is informed and believes, and on that basis alleges, that Defendant Brian Biggs is an individual residing in Connecticut.

23.     Warner Bros. is informed and believes, and on that basis alleges, that Defendant Dawn Biggs is an individual residing in Connecticut.

24.     Warner Bros. is informed and believes, and on that basis alleges, that Brian Biggs and Dawn Biggs own and control Random Tuesday, Inc., acting as Chief Executive Officer and Chief Creative Officer, respectively.  Warner Bros. is further informed and believes, and on that basis further alleges, that each Defendant named herein was at all times mentioned in this complaint an agent of the other Defendants, and in doing the things alleged in this complaint was acting in concert with and as the agent of the other Defendants.

### THE *HARRY POTTER* BOOK SERIES

25.     *Harry Potter* is a seven-volume series of fantasy novels written by author J.K. Rowling (the "Book Series").  The novels follow a young wizard, Harry Potter, through his life at Hogwarts School of Witchcraft and Wizardry and portray his fight against the world of dark magic led by Lord Voldemort.

26.     The Book Series is one of the bestselling series of all time.  Each of the *Harry Potter* novels has sold over 60 million copies worldwide.  The first book, *Harry Potter and the Sorcerer's Stone* (titled *Harry Potter and the*

*Philosopher's Stone* in the British version) topped 120 million copies.  By the publication of the fourth book in 2000, fans lined up to buy copies at midnight release parties.  These parties became so popular that the final book broke the fastest-selling book record with more than 11 million copies purchased in the first 24 hours.  Today, the Book Series remains one of the most well-known, popular, and beloved series of literary works of all time.

27.     The Book Series has received widespread acclaim, and its cultural impact has been recognized by multiple media outlets.  For example, *The New York Times* best seller list included the Book Series multiple times.  The Book Series also received a multitude of awards, including the Whitaker Platinum Book Awards, Nestle Smarties Book Prizes, and the Hugo Award for Best Novel.

## THE *HARRY POTTER* FILMS, MERCHANDISE, GAMES, AND THEMED EXPERIENCES

28.     Pursuant to *Harry Potter* author J.K. Rowling's grant of rights to Warner Bros., Warner Bros. developed, produced, and distributed the *Harry Potter* motion picture franchise, with eight films directly adapted from the novels. Warner Bros. subsequently developed, produced, and distributed a related film in 2016 using the same fictional universe titled *Fantastic Beasts and Where to Find Them*.  A further related film, titled *Fantastic Beasts: The Crimes of Grindelwald*, was released in theatres in November 2018.  Additional related films are in production.  Both the *Harry Potter* and *Fantastic Beasts* franchises, together with all their related products, services, experiences, and dimensions, are known under the umbrella brand of the "Wizarding World."

29.     The *Harry Potter* films have had enormous commercial success, contributing to the worldwide fame of the *Harry Potter* franchise properties.  Six of the eight original *Harry Potter* films were nominated for a total of twelve Academy Awards, and together the films have grossed approximately $7.7 billion at the box office worldwide.  Because of the enormous and enduring popularity of

the Book Series and the Warner Bros. films, fanciful terms and character names such as "Hogwarts," "Harry Potter," "Lord Voldemort," "Dumbledore," and "Platform 9 ¾," as well as the Hogwarts house names "Gryffindor," "Hufflepuff," "Ravenclaw," and "Slytherin," and their related imagery, have become widely known among the consuming public to indicate the distinctive fantasy characters and settings originally created by Ms. Rowling and portrayed in the Warner Bros. motion pictures.

30.     The widespread success of the *Harry Potter* films created and cultivated a devoted fan following that endures and thrives to this day.  The official *Harry Potter* film Facebook page has over 72 million followers and "likes" to date, while its Twitter feed boasts over two million followers.

31.     The popularity of the franchise has created an enormous demand for products, services, and themed experiences related to the *Harry Potter* universe, to which Warner Bros. has responded by creating products, services, and experiences and by licensing other entities to do the same.

32.     Warner Bros. is engaged in numerous, highly varied, and ever-expanding uses in commerce of its extraordinarily well-known and popular *Harry Potter* properties, copyrights, and related trademarks, including in connection with motion pictures, clothing, hats, scarves, socks, footwear, costumes, games, toys, collectibles, water bottles, mugs, drinkware, blankets, bedding,  home décor, travel accessories, phone cases, neckties, stationery, sports gear, and sports-type jerseys.

33.     Warner Bros., working with outside developers and game publishers, has released numerous video games on various platforms based on the fictional world of *Harry Potter*.  These videogames were developed beginning in 2001 and have been released for use on personal computers, game platforms including PlayStation, and mobile devices.  One recent mobile game called "Hogwarts Mystery" allows players to immerse themselves in the *Harry Potter* universe as virtual students at Hogwarts.  More recently, a widely anticipated mobile game

called "Wizards Unite," also based on the Wizarding World universe, was released in June 2019.

34.    Warner Bros.' uses of its copyrighted and trademarked properties include numerous and varied other immersive themed experiences, including the world-famous "Wizarding World of Harry Potter" theme park attractions and all of their included activities, as well as restaurants, studio tours, themed dinners, celebrations, and other events.  In addition, in the area of health and fitness, Warner Bros. has licensed other well-known properties such as Wonder Woman and Scooby Doo for use in connection with live and virtual races, as well as race-related merchandise such as clothing, caps, tote bags, water bottles, race medals, and headbands.

35.    The first Wizarding World of Harry Potter theme park opened at the Universal Orlando Resort in Orlando, Florida, in June 2010 and became an overnight success, drawing millions of visitors a year.  Following the success of the Universal Orlando Wizarding World of Harry Potter, subsequent Wizarding World theme parks opened at Universal Studios Japan in Osaka, Japan (in July 2014), and at Universal Studios Hollywood in Universal City, California (in April 2016).  The parks' ability to immerse visitors in the *Harry Potter* universe is particularly showcased by the "Christmas in the Wizarding World" events that take place during the holiday season.  The restaurants and shops based on the Hogsmeade village from the *Harry Potter* books and films are transformed with festive décor, holiday-themed food and drink, and holiday entertainment.

36.    Based on the popularity of the *Harry Potter* brand and public curiosity about the making of the *Harry Potter* films, Warner Bros. opened a studio tour experience to visitors in 2012 at the Warner Bros. studios located in Leavesden in the United Kingdom, called "The Making of Harry Potter."  The tour allows visitors to see in person the set pieces, props, costumes, and locations used in the films.  The tour welcomes up to 6,000 visitors per day.  Hogwarts-themed

immersive experiences are offered at the Leavesden facility, including "Dinner in the Great Hall" and "Hogwarts in the Snow," which are regularly sold out.  The "Dinner in the Great Hall" events allow fans to enjoy a meal in the actual Great Hall set from the *Harry Potter* films and to experience foods, drinks, and traditions from the *Harry Potter* universe.  The "Hogwarts in the Snow" experience is specifically geared toward allowing studio visitors to discover how filmmakers create fire, ice, and snow that does not melt for the movies.

37.     Since at least 2014, the Wizarding World of Harry Potter theme park in Orlando also has hosted a number of three-day "Celebration of Harry Potter" events, which have included Q&A panels with *Harry Potter* actors, an exposition, movie screenings, and features such as a "wand skills" class taught by a choreographer of wand scenes from the films.  During the weekend, fans also were able to participate in workshops with costume designers, special effects experts, and graphic designers who worked on the *Harry Potter* films.  Additionally, fans could purchase licensed *Harry Potter*-themed merchandise.

38.     Warner Bros. has licensed *Harry Potter* intellectual property for use in other immersive learning and museum-type experiences.  *Harry Potter: the Exhibition* is a traveling museum experience allowing visitors to view artifacts, iconic costumes, and props that appeared in the *Harry Potter* films.  Additionally, the *Harry Potter* films and music have been licensed for popular "CineConcert" events, where live musicians perform the score for various *Harry Potter* films played in an amphitheater setting.

## THE *HARRY POTTER* MARKS

39.     Since Warner Bros. released the first *Harry Potter* film in 2001, it has used in commerce and owns all right, title, and interest in numerous distinctive and famous trademarks derived from the names of the fictional people, places, and things depicted in the *Harry Potter* franchise, which include such famous marks as HARRY POTTER, HOGWARTS, HOGSMEADE, GRYFFINDOR,

HUFFLEPUFF, RAVENCLAW, SLYTHERIN, DIAGON ALLEY, DOBBY, DUMBLEDORE, GOLDEN SNITCH, SEEKER, OLLIVANDERS, BUTTERBEER, PLATFORM 9 ¾, PATRONUS, QUIDDITCH, HERMIONE GRANGER, RON WEASLEY, LUCIUS MALFOY, HALF-BLOOD PRINCE, and many others (the "HP Marks").  The HP Marks are arbitrary and fanciful terms and are inherently distinctive trademarks and symbols of the Harry Potter franchise.  Moreover, as a result of the long and extensive use of the HP Marks by Warner Bros. and its licensees, the HP marks have long been recognized by the public as uniquely associated with Warner Bros. and its Harry Potter franchise.

40.     In addition, Warner Bros. owns and/or controls exclusive rights in inherently distinctive forms of trade dress derived from images depicted in the *Harry Potter* films, as well as copyrights in the *Harry Potter* motion pictures, their distinctive visual elements, and artwork used in connection with the numerous and varied aspects of the franchise.

41.     Many of the HP Marks are registered in a variety of International Classes ("Classes"), including Classes 9, 14, 16, 18, 20, 21, 24, 25, and 28. Among other things, Class 9 covers pre-recorded DVDs, featuring fantasy films, and fantasy games and/or cartoons; Class 14 covers precious metals, including pins and jewelry; Class 16 covers paper goods, books, stationery, and the like; Class 18 pertains to bags and leather goods; Class 20 covers furniture and resin figures; Class 21 covers household utensils and apparatus; Class 24 encompasses textiles and textile goods, including bedding and home décor; Class 25 includes most types of clothing, footwear, and headgear; and Class 28 covers games, sporting goods, and holiday items.  Together, Warner Bros.' registrations in these Classes cover, among other things, printed matter, comic books, books, magazines, periodicals, games, sporting goods, holiday items, clothing, textiles, home goods, furnishings, visuals, computer games, films, toys, action figures, entertainment services,

production and distribution of motion pictures, and series provided through the Internet.

42.     Among other federal trademark registrations, Warner Bros. owns Registration Nos. 2,491,427; 2,495,015; 2,497,076; 2,550,774; 3,986,326; 3,986,328; and 4,053,475 for HOGWARTS (issued on September 18, 2001, October 2, 2001, October 9, 2001, March 19, 2002, June 28, 2011 (both 3,986,326 and 3,986,328), and November 8, 2011, respectively, and registered in Classes 9, 14, 16, 18, 20, 25, and 28).  These registrations all are valid, subsisting, and incontestable.

43.     Warner Bros. also owns Registration Nos. 2,450,787; 2,450,788; 2,457,302; 2,479,341; 2,493,484; 2,497,083; 2,506,165; 2,506,166; 2,525,908; 2,526,111; 2,530,755; 2,683,060; 2,685,932; and 3,926,486 for HARRY POTTER (issued on May 15, 2001 (both 2,450,787 and 2,450,788), June 5, 2001, August 21, 2001, September 25, 2001, October 9, 2001, November 13, 2001 (both 2,506,165 and 2,506,166), January 1, 2002 (both 2,525,908 and 2,526,111), January 15, 2002, February 4, 2003, February 11, 2003, and March 1, 2011, respectively, and registered in Classes 9, 14, 16, 18, 20, 21, 24, 25, and 28).  These registrations are all valid, subsisting, and incontestable.

44.     Warner Bros. also owns Registration Nos. 2,480,839; 2,516,387; 2,607,934; 3,998,723; 3,998,724; 4,019,867; and 4,023,249 for GRYFFINDOR (issued on August 21, 2001, December 11, 2001, August 13, 2002, July 19, 2011 (both 3,998,723 and 3,998,724), August 30, 2011, and September 6, 2011, respectively, and registered in Classes 9, 14, 16, 18, 20, 25, and 28).  These registrations all are valid, subsisting, and incontestable.

45.     In addition, Warner Bros. owns Registration Nos. 2,505,434; 3,994,445; 4,002,982; 4,023,250; 4,061,026; and 4,074,874 for HUFFLEPUFF (issued on November 6, 2001, July 12, 2011, July 26, 2011, September 6, 2011, November 22, 2011, and December 20, 2011, respectively, and registered in

Classes 14, 16, 18, 20, 25, and 28).  These registrations all are valid, subsisting, and incontestable.

46.     Warner Bros. also owns Registration Nos. 2,719,635; 3,994,446; 4,023,251; 4,227,388; 4,226,195; and 4,396,409 for RAVENCLAW (issued on May 27, 2003, July 12, 2011, September 6, 2011, October 16, 2012 (both 4,227,388 and 4,226,195), and September 3, 2013, respectively, and registered in Classes 14, 16, 18, 20, 25, and 28).  These registrations all are valid, subsisting, and incontestable.

47.     Moreover, Warner Bros. owns Registration Nos. 2,508,004; 2,525,903; 3,994,447; 4,002,983; 4,023,252; 4,026,600; and 4,132,174 for SLYTHERIN (issued on November 13, 2001, January 1, 2002, July 12, 2011, July 26, 2011, September 6, 2011, September 13, 2011, and April 24, 2012, respectively, and registered in Classes 14, 16, 18, 20, 24, 25, and 28).  These registrations all are valid, subsisting, and incontestable.

48.     Warner Bros. also owns Registration Nos. 2,456,415; 2,483,585; 3,986,052; 3,986,060; 4,019,970; and 4,109,233 for QUIDDITCH (issued on March 29, 2001, August 28, 2001, June 28, 2011 (both 3,986,052 and 3,986,060), August 30, 2011, and March 6, 2012, respectively, and registered in Classes 9, 14, 16, 24, 25, and 28).  These registrations all are valid, subsisting, and incontestable.

49.     Additionally, Warner Bros. owns Registration Nos. 4,969,076 and 5,091,446 for PLATFORM 9 ¾ (issued on May 31, 2016, and November 29, 2016, respectively, and registered in Classes 18 and 25).  These registrations all are valid and subsisting.

50.     In addition, Warner Bros. owns Registration Nos. 5,251,424; 5,710,360; 5,734,453; and 5,956,041 for FANTASTIC BEASTS (issued on July 25, 2017, March 26, 2019, April 23, 2019, and January 7, 2020, respectively, and registered in Classes 9, 16, 25, and 28).  Warner Bros. also owns Registration Nos. 4,928,689; 4,952,370; 5,140,245; and 5,166,914 for the Deathly Hallows Triangle

Design element and the word mark DEATHLY HALLOWS (issued on March 29, 2016, May 3, 2016, February 14, 2017, and March 21, 2017, respectively, and registered in Classes 9, 14, and 25). These registrations all are valid and subsisting.

51. Furthermore, Warner Bros. owns Registration No. 4,983,875 for the Dobby mark/element and the word mark DOBBY (issued on June 21, 2016, and registered in Class 28). Warner Bros. owns Registration Nos. 4,451,666 and 5,625,574 for GOLDEN SNITCH (issued on December 17, 2013, and December 11, 2018, respectively, and registered in Classes 21 and 28). Warner Bros. owns Registration No. 3,508,583 for DUMBLEDORE'S ARMY (issued on September 30, 2008, and registered in Class 25). Warner Bros. also owns Registration Nos. 2,702,878; 2,696,122; and 3,966,674 for ALBUS DUMBLEDORE (issued on April 1, 2003, March 11, 2003, and May 24, 2011, respectively, and registered in Classes 16, 25, and 28). Finally, Warner Bros. owns Registration No. 4,060,320 for PROFESSOR DUMBLEDORE (issued on November 22, 2011, and registered in Class 28). These registrations all are valid and subsisting, and Registration Nos. 4,451,666; 3,508,583; 2,702,878; 2,696,122; 3,966,674; and 4,060,320, for GOLDEN SNITCH, DUMBLEDORE'S ARMY, ALBUS DUMBLEDORE, and PROFESSOR DUMBLEDORE, respectively, are incontestable.

52. Warner Bros.' trademark rights extend well beyond these registrations, as the HP Marks have become iconic symbols of Warner Bros.' *Harry Potter* entertainment franchise and related merchandise for many years. Warner Bros. accordingly has acquired exclusive common law rights in the HP Marks throughout the United States by virtue of its prominent and continuous use of the HP Marks in commerce.

## *HARRY POTTER* COPYRIGHTS

53. Warner Bros. owns federal copyright registrations or exclusive distribution rights and all merchandise rights for each of the *Harry Potter* films.

The motion picture registrations include No. PA 1-063-646 for *Harry Potter and the Sorcerer's Stone* (registered November 28, 2001); No. PA 1-105-748 for *Harry Potter and the Chamber of Secrets* (registered December 6, 2002); No. PA 1-222-542 for *Harry Potter and the Prisoner of Azkaban* (registered July 1, 2004); No. PA 1-279-121 for *Harry Potter and the Goblet of Fire* (registered February 15, 2006); No. PA 1-355-547 for *Harry Potter and the Order of the Phoenix* (registered September 21, 2007); No. PA 1-647-906 for *Harry Potter and the Half-Blood Prince* (registered October 23, 2009); No. PA 1-721-904 for *Harry Potter and the Deathly Hallows Part 1* (registered March 4, 2011); and No. PA 1-742-099 for *Harry Potter and the Deathly Hallows Part 2* (registered July 22, 2011).

54.    In addition, Warner Bros. owns copyright registrations for multiple Style Guides containing images from the *Harry Potter* films and images of authorized merchandise.  These registrations include the following works from which Defendants have reproduced images without permission for use in their marketing activities and merchandise: No. VAu 477-989 for *Harry Potter and the Sorcerer's Stone Style Guide* (registered June 1, 2000); No. VAu 1-298-442 for *Harry Potter and the Order of the Phoenix Style Guide* (registered November 16, 2017); No. VAu 1-298-518 for *Harry Potter and the Sorcerer's Stone Style Guide* (registered November 16, 2017); No. VAu 1-298-630 for *Harry Potter and the Prisoner of Azkaban Style Guide* (registered November 16, 2017); and No. VAu 1-317-699 for *Harry Potter and the Deathly Hallows Part 1 Style Guide* (registered November 15, 2017).

55.    These motion picture and style guide copyrights encompass numerous distinctive visual elements from the *Harry Potter* motion pictures, such as the Hogwarts Crest and the individual Hogwarts house crests, images of the Great Hall at Hogwarts Castle, the triangular "Deathly Hallows" symbol, and the iconic "Platform 9 ¾" emblem, among others.

## THE *GILMORE GIRLS* TELEVISION SERIES

56.     The *Gilmore Girls* television series is a comedy-drama produced by Warner Bros. Television that debuted on The WB television network in October 2000.  The series ran an initial seven seasons.  More than a decade later, Netflix ran a revival mini-season.  The television series received multiple awards.  For example, *Gilmore Girls* was named "Outstanding New Program of the Year" by the Television Critics Association and won an Emmy Award in 2004 for "Outstanding Makeup for a Series."  Lauren Graham (one of the show's main actresses) was nominated for "Outstanding Performance by a Female Actor in a Drama Series" by the Screen Actors Guild Awards and was also nominated for "Best Performance by an Actress in a Television Series Drama" by the Golden Globes.

57.     The initial television series attracted close to five million viewers weekly during the series run and continues to be enjoyed by fans to this day through video-on-demand streaming, purchased downloads, and DVD sales. *Gilmore Girls* has generated hundreds of millions of dollars in revenues, including by virtue of a wide variety of merchandise offered by dozens of licensees that encompasses books, greeting cards, clothing, novelties (including mugs, phone cases, pens, and wallets), posters, and stationery, among other items.  It is one of the most popular television series that has ever aired on its respective networks.

### *GILMORE GIRLS* TRADEMARKS AND COPYRIGHTS

58.     Warner Bros. owns exclusive rights in distinctive and famous trademarks and trade dress derived from the characters, places, and things depicted in the *Gilmore Girls* television series (the "GG Marks"), which include CHILTON ACADEMY, GILMORE GIRL, LUKE'S DINER, AL'S PANCAKE WORLD, STARS HOLLOW, and DRAGONFLY INN, among others, as well as signature phrases from the show such as "In Omnia Paratus" when used in connection with the series.  The GG Marks are arbitrary and fanciful terms and are inherently

distinctive trademarks and symbols of the *Gilmore Girls* franchise.  Moreover, as a result of the long and extensive use of the GG Marks by Warner Bros. and its licensees, the GG marks have long been recognized by the public as uniquely associated with Warner Bros. and its *Gilmore Girls* franchise.

59.    Many of the GG Marks are registered in a variety of International Classes, including Classes 9, 12, 14, 16, 18, 20, 21, 24, 25, 26, 28, and 41.  Among other things, Class 9 covers cellular telephone accessories and laptop computer accessories; Class 12 covers vehicle accessories; Class 14 covers precious metals, including pins and jewelry; Class 16 covers paper goods, books, stationery, and the like; Class 18 pertains to bags and leather goods; Class 20 covers pillows and picture frames; Class 21 covers glass, ceramic, and earthenware goods and containers; Class 24 encompasses textiles and textile goods, including bedding and home décor; Class 25 includes most types of clothing, footwear, and headgear; Class 26 covers clothing accessories and ornamental pins; Class 28 covers games, sporting goods, and holiday items; and Class 41 covers entertainment services. Together, Warner Bros.' registrations in these Classes cover, among other things, printed matter, games, sporting goods, holiday items, clothing, textiles, home goods, furnishings, toys, action figures, and entertainment services.

60.    Warner Bros. owns Registration Nos. 3,214,845; 3,221,488; 5,919,727; 5,919,728; 5,919,730; 5,919,731; 5,919,732; 5,919,733; 5,919,734; 5,919,735; 5,919,737; 5,919,738; and 5,936,317 for GILMORE GIRLS (issued on March 6, 2007, March 27, 2007, November 26, 2019 (for 5,919,727; 5,919,728; 5,919,730; 5,919,731; 5,919,732; 5,919,733; 5,919,734; 5,919,735; 5,919,737; and 5,919,738), and December 17, 2019, respectively, and registered in Classes 9, 12, 14, 16, 18, 20, 21, 24, 25, 26, 28, and 41).  These registrations are valid and subsisting, and Registration Nos. 3,214,845 and 3,221,488 are incontestable.

61.    Warner Bros.' trademark rights extend well beyond these registrations, as the GG Marks have become iconic symbols of Warner Bros.'

*Gilmore Girls* entertainment franchise and related merchandise for many years. Warner Bros. accordingly has acquired exclusive common law rights in the GG Marks throughout the United States by virtue of its prominent and continuous use of the GG Marks in commerce.

62.     Warner Bros. also owns federal copyright registrations for each episode of the *Gilmore Girls* television series.  As an example, the first episode of the series, *Pilot*, is registered as No. PA 1-079-288 (registered March 29, 2002). These copyright registrations encompass numerous distinctive visual elements from the *Gilmore Girls* series.  In addition, Warner Bros. owns a copyright registration for a Style Guide, No. VAu 1-296-434 (registered November 17, 2017), containing images and logos from the *Gilmore Girls* television series.

## DEFENDANTS' INFRINGING CONDUCT

63.     Long subsequent to the adoption and use by Warner Bros. of its *Harry Potter* and *Gilmore Girls* intellectual property, and without any authorization or permission from Warner Bros., Defendants began using the HP Marks and GG Marks and other of Warner Bros.' intellectual property to brand their businesses and business activities and to market and sell the same kinds of merchandise as Warner Bros. and its licensees.

64.     Defendants' themed businesses at issue here – formerly branded as Hogwarts Running Club and Chilton Running Club, and currently branded as Potterhead Running Club and Chilton Running Club – are engaged in extensive, nationwide commercial activities.  Defendants' manifest intention has been to attract customers and build up their businesses by free-riding on the widespread and enduring fame and popularity of the renowned *Harry Potter* and *Gilmore Girls* entertainment properties.  Defendants have done so by creating a false commercial impression that their businesses, products, and services are sponsored, endorsed, produced, or licensed by Warner Bros. or are otherwise connected or affiliated with Warner Bros.

65.     The Clubs have branded themselves with HP and GG Marks.  They organize virtual running races whereby they collect fees in exchange for providing medals and other merchandise displaying the HP Marks and GG Marks.  The Clubs have branded and market their race activities using the HP Marks and GG Marks, or confusingly similar variations thereof.  In addition, the Clubs' websites have offered for sale and continue to sell a wide variety of unauthorized merchandise bearing the HP Marks and GG Marks, including hats, t-shirts, stickers, hairbands, mugs, lip balm, toys, novelties, and running medals.

66.     Defendants' infringing and diluting use of the HP Marks is as basic as the name of the business itself.  Until late 2018, Defendants branded their *Harry Potter*-themed running club using Warner Bros.' registered trademark HOGWARTS.  The Hogwarts Running Club's logo also was infringing.  As depicted below, it utilized an image that is confusingly similar to the Hogwarts Crest featured in the *Harry Potter* films.  Both employ crest designs that are nearly identical in shape.  The crests also have similar dark coloring and are divided into four parts (to represent the four Hogwarts Houses), and both logos prominently feature the "Hogwarts" name:

  

**Plaintiff's Use**                    **Defendants' Use**

67.     As noted above, in January 2019, Defendants renamed this running club the "Potterhead Running Club" – a reference to the central character in the *Harry Potter* Book Series and motion picture franchise.  Despite the name change,

Defendants have continued to use as part of their logo a crest that mimics the Hogwarts Crest:





**Plaintiff's Use**                    **Defendants' Use**

68.     Defendants also have used Warner Bros.' intellectual property extensively on the website for their *Harry Potter*-themed running club.  The website has included banners depicting images closely associated with the *Harry Potter* films, such as Diagon Alley and the Great Hall at Hogwarts.  These images have infringed Warner Bros.' copyrights, and the names on the banners are confusingly similar to Warner Bros.' trademarks.  For example, Defendants replaced the word marks SLYTHERIN and RAVENCLAW with the variations "Slytherwin" and "Ravenclawesome."  The image of Diagon Alley that formerly appeared on the website includes a clear view of Gringotts Wizarding Bank, an iconic image from the *Harry Potter* films.

## The Great Hall:





**<u>Diagon Alley</u>:**



69.    Defendants also have made extensive of Warner Bros.' HP Marks on medallions, images of which still appear on Defendants' website.  For example, Defendants used "Platform 9 ¾" as the basis for one of their Hogwarts Running Club race medals.  As depicted below, not only did Defendants make prominent use of the famous, registered "Platform 9 ¾" mark, but they also employed a nearly identical font with a similar red and black color scheme:





**Plaintiff's Use**                    **Defendants' Use**

70.     Defendants used the Deathly Hallows Triangle Design, another Warner Bros. trademark, as the basis for another race medal.  As shown below, the medal closely mimics the design and shape of Warner Bros.' registered mark:



**Plaintiff's Use**                                    **Defendants' Use**

71.     In another example, Defendants used the registered mark for "Dumbledore's Army" as the basis for a race medal.  The medal features an identical font and the same stylized letters "D.A.":

 

**Plaintiff's Use**                                    **Defendants' Use**

The website for Defendants' Potterhead Running Club still sells these and other past infringing medals in a section called "Vault 687" – a reference to the vault in Gringotts Wizarding Bank owned by Harry Potter's family.

72.     In addition to their use of confusingly similar and misleading designs on race medals, Defendants also have used HP Marks on a wide variety of consumer merchandise, including t-shirts, sweatshirts, water bottles, shopping bags, and stickers, as shown below, all of which were offered for sale in Defendants' online store called Horizont Alley (an obvious play on "Diagon

Alley"):



73.     Defendants also have used the Hogwarts Crest on socks, water bottles, and hats, and the word marks HUFFLEPUFF, SLYTHERIN, RAVENCLAW, and GRYFFINDOR on hairbands, as shown below.  Defendants included the Hogwarts Crest along with the traditional Hogwarts house colors and mascots on socks.

//
//
//
//
//
//
//
//
//

**Examples:**






Following the January 2019 name change, Defendants through their online store have continued to sell water bottles, stickers, magnets, Christmas ornaments, and other merchandise featuring the Hogwarts Running Club name and crest.

74.     In addition, Defendants have created and sold t-shirts using each of the four Hogwarts Houses (Gryffindor, Ravenclaw, Hufflepuff, and Slytherin) and replicated the crest of each house.  As depicted below, Defendants used the same color scheme (burgundy and gold), the same crest shape, a similar drawing of a lion, and the same large "G" for its Gryffindor shirt.  As shown below, Defendants also identified these items of infringing merchandise by reference to the trademarked Hogwarts House names (e.g., the "Gryffindor House Shirt").

//

//

//

   

**Plaintiff's Use**                    **Defendants' Use**

75.     Similarly, Defendants displayed the Quidditch game "Golden Snitch" object on a t-shirt that used a substantially indistinguishable design and golden color scheme as the Warner Bros. mark:

 

**Plaintiff's Use**                    **Defendants' Use**

76.     Defendants also have sold race t-shirts that bear distinctive terms and emblems associated with the *Harry Potter* fictional universe, including DUMBLEDORE'S ARMY, QUIDDITCH, 9 ¾, and the Ministry of Magic's stylized "M" logo, as shown below:

 

1
2
3
4
5
6
7



8   77.    Defendants also have sold metal hangers to display its race medals
9 with the Hogwarts Crest, alongside the word mark HOGWARTS:

10
11
12
13
14
15
16



17   78.    Furthermore, Defendants have offered for sale apparel bearing a
18 copyrighted image of the "Fluffy the Dog" character from the *Harry Potter*
19 fictional universe:

20
21
22
23
24
25
26



27   **Plaintiff's Use**          **Defendants' Use**
28

79.     In addition, Defendants have used the *Harry Potter* term "Prefect" to identify a race participant who has registered for all seven events in a given calendar year.  In recognition of this status, Defendants have stated that participants are awarded a "pin," which contains a Hogwarts Crest that is nearly identical to that of Warner Bros.' registered mark.  The infringing crest has each of the four Houses depicted using the same animals and color scheme with a prominent "H" in the center of the crest:



**Plaintiff's Use**                    **Defendants' Use**

80.     Defendants recognized these race participants in a "Perfect Prefect Hall of Fame" page on the Hogwarts Running Club website, which listed the names of all race participants who had been awarded the "Prefect" pin.  The webpage grouped names by Hogwarts Houses and Hogwarts "Faculty."  This page used themes, styles, images, and other intellectual property owned by Warner Bros., as shown below:

Perfect Prefect Hall Of Fame



Hogwarts Running Club

The following members of Hogwarts Running Club distinguished themselves by registering for all six events plus the Challenge event for a total of seven events in a given calendar year. In honor of their accomplishment, and their dedication to Hogwarts Running Club, we hereby name them Perfect Prefects and enshrine them here for all time.

2016 | 2015 | 2014

2016

Gryffindor | Slytherin | Hufflepuff | Ravenclaw | Faculty



Defendants' current website for the Potterhead Running Club continues to include a "Perfect Prefect Hall of Fame."

81.     In late 2018, despite their statements about rebranding Hogwarts Running Club, Defendants introduced a proliferation of merchandise in their online store that made prominent use of the HP Marks.  This merchandise, available for purchase through Defendants' Horizont Alley online store, included a line of trucker hats that feature close variations of the Hogwarts house names.  These products, shown in one example below, bear the names "Gryffinroar," "Huffletuff," "Slytherwin," and "Ravenclawesome":

 

The website's accompanying description underscored Defendants' obvious intent to trade on the popularity of the *Harry Potter* works and marks, explaining that "These custom Headsweats trucker hats are only available here on Horizont Alley **and feature each Hogwarts House** on the front and the corresponding hashtag on the back."  Defendants also recently began offering for sale dog tags emblazoned with the HOGWARTS variation "Dogwarts," as well as variations of the Hogwarts House names such as "Gryffindog," "Hufflepup," "Slytherhünd," and "Ravenpaw."  Each dog tag also included the message: "If found, please return to the MINISTRY OF MAGIC," as shown below:



82.     In addition, Defendants have recently hosted and promoted several "virtual run" races that conspicuously trade on the HP Marks and their popular appeal.  For example, Defendants' August 2019 race "celebrat[ed] one of Fred & George's greatest (and definitely the cutest) creations: The Pygmy Puff!," using the popular *Harry Potter* magical creature, the "Pygmy Puff," as its theme:



The Pygmy Puff is a distinctively pink or purple, fluffy magical creature uniquely

associated with the *Harry Potter* universe; the most well-known Pygmy Puff is one owned by the Ginny Weasley character and named Arnold.

83.     Promotions for this Pygmy Puff-themed race often traded on associations with these characters.  For example, one promotion alluded to celebrating Ms. Weasley's birthday and another referenced and purportedly depicted Arnold:

 

 

A July 2019 promotion for this event directly quoted the Book Series.  And as shown above, the featured race medals for this race were purple, furry Pygmy Puffs.

84.     Similarly, Defendants' September 2019 race was themed "Platform

Year Six": Defendants' transparent play on the iconic "Platform 9 ¾" is made even clearer with race medals that feature "9 ¾" in a nearly identical font and a similar red and black color scheme as Warner Bros.' licensed merchandise; a transparent edge as though the medallions are "partially covered by an invisibility cloak"; and illustrations of Diagon Alley, Weasleys' Wizarding Wheezes, and a *Petrificus Totalus* spell:



We run as one.

85.    In addition, Defendants' January 2020 race, called the "Ironbelly 7k," used "the trio's [referring to Harry Potter and his friends Ron Weasley and Hermione Granger] thrilling escape from Gringotts and the freeing of the Ukrainian Ironbelly dragon" as its theme.  Defendants "featur[ed] the Ukrainian Ironbelly" and a "Gringotts crest" on their race medals, and promotions directly quoted the Book Series:

//

//

//

//

//




© January 4, 2020

"And they turned a corner and saw the thing for which Harry had been prepared, but which still brought all of them to a halt."

86.   And the March 2020 race, which Defendants are currently promoting, is themed "Undesirable No. 2." The theme is yet another transparent play on words by Defendants, this time on the "Undesirable No. 1" label used in reference to Harry Potter and on the Ministry of Magic logo:






**Plaintiff's Use**                                    **Defendants' Use**

Yet again, Defendants use a nearly identical font, format, design, and color scheme as Warner Bros.' licensed merchandise, and Defendants directly quote the Book Series in promotions.

87.     Defendants also have collaborated with third parties in misappropriating and profiting from Warner Bros.' trademarks.  For example, certain garments bearing the Hogwarts Running Club's logo based on the Hogwarts Crest, appeared and still appear for sale on the website Bolderathleticwear.com, previously known as Sparkleskirts.com.  Like all items bearing the Hogwarts Running Club logo, these items infringe Warner Bros.' trademarks both in the designs' similarity to the trademarked Hogwarts Crest and in the use of the word mark HOGWARTS.

**Examples:**

   

 

Defendants' website also links to Teepublic.com, where numerous items bearing the "Potterhead Running Club" name and crest are offered for sale.

88.     The Chilton Running Club name is derived from Chilton Academy, the name of the fictional school that is at the center of the *Gilmore Girls* television series.  The Club's logo also uses visual elements closely associated with and depicted in the *Gilmore Girls* series, such as the dragonfly symbol shown below. The dragonfly symbol is an obvious reference to the fictional Dragonfly Inn owned

by the protagonist in *Gilmore Girls* television series and is used in Warner Bros.' licensed merchandise, as shown below:





**Plaintiff's Use**                    **Defendants' Use**

89.    Defendants' Chilton Running Club also has made use of Warner Bros.' trademarks in selling merchandise to benefit the Defendants' business.  For example, the Chilton Running Club has sold apparel prominently featuring the "Chilton" name, in which Warner Bros. owns trademark rights:




**Plaintiff's Use**                    **Defendants' Use**

90.    The Club has also sold infringing merchandise bearing its logo, such as water bottles and lip balm:




91.     Furthermore, as depicted below, the Facebook page for the Chilton Running Club has posted online a large number of copyrighted clips and stills from *Gilmore Girls* episodes.  The images posted also indicate unauthorized commercial sponsorships and tie-in promotional activity with Chanel No. 5 perfume and Kellogg's Pop-Tarts.  These clips and stills are unauthorized uses of Warner Bros.' copyrighted material and directly infringe Warner Bros.' copyrights in the *Gilmore Girls* television series.

**Examples:**













-39-
COMPLAINT

**FIRST CLAIM FOR RELIEF**

**TRADEMARK INFRINGEMENT AND TRADEMARK**

**COUNTERFEITING – 15 U.S.C. § 1114**

92.     Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

93.     Warner Bros. is the exclusive owner of the registered HP Marks and GG Marks.  Each of the trademark registrations relating to the HP Marks and GG Marks is in full force and effect.

94.     Warner Bros.' registered HP Marks and GG Marks are inherently distinctive and have become well-known and famous.  This is a result both of the marks' inherent distinctiveness and the extensive advertising and sales throughout the United States of goods and services bearing the HP Marks and GG Marks by Warner Bros. and its licensees.

95.     As described above, Defendants have used the registered HP Marks and GG Marks in commerce, without Warner Bros.' authorization or consent and in an explicitly misleading manner, by using the registered HP Marks and GG Marks in the names of Defendants' running clubs and by advertising, offering for sale, and/or the sale of Defendant's activities and various items of infringing merchandise.  Warner Bros. is informed and believes, and on that basis alleges, that Defendants have done so willfully with the intent to unfairly compete against Warner Bros., to trade upon Warner Bros.' reputation and goodwill by causing confusion and mistake among customers and the public, and to deceive the public into believing that Defendants and their Clubs are associated with, sponsored by, or approved by Warner Bros., when they are not.  Defendants' unauthorized use of imitations of Warner Bros.' registered HP Marks and GG Marks is likely to cause and has caused confusion, mistake, or deception in violation of 15 U.S.C. § 1114.

96.     Defendants' aforementioned acts have injured Warner Bros. and damaged it in an amount to be determined at trial.  By their actions, Defendants

also have irreparably injured Warner Bros.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined by the Court from further violation of Warner Bros.' rights.  In addition, Defendants' intentional and willful conduct makes this an exceptional case entitling Warner Bros. to recover treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117.

97.     Furthermore, as described above, Defendants have used spurious marks, without authorization from Warner Bros., that are identical to or substantially indistinguishable from Warner Bros.' registered HP Marks and GG Marks, listed above in paragraphs 39 through 52 and 58 through 61, which constitutes use of counterfeit marks in violation of 15 U.S.C. § 1114.  As a result of such counterfeiting by Defendants, Warner Bros. is also entitled to recover attorneys' fees, treble damages, and/or statutory damages of up to $2 million per counterfeit mark per type of goods or services sold, pursuant to 15 U.S.C. § 1117.

## SECOND CLAIM FOR RELIEF

### FALSE DESIGNATION OF ORIGIN AND

### UNFAIR COMPETITION – 15 U.S.C. § 1125(a)(1)(A)

98.     Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

99.     The HP Marks and GG Marks and have been used extensively by Warner Bros. and its licensees in commerce, are non-functional, are distinctive, have acquired substantial secondary meaning in the marketplace, and have become associated in the public's mind with Warner Bros.' products, services, and entertainment franchises.

100.   As described above in detail, the Defendants are using in commerce, without Warner Bros.' authorization or consent and in a confusing and misleading manner, imitations of the HP Marks and GG Marks, and confusingly similar variations thereof, in commerce to brand their businesses and to advertise, market, and sell their own infringing activities and merchandise.  This conduct constitutes

false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

101.   Warner Bros. is informed and believes, and on that basis alleges, that Defendants had actual knowledge of Warner Bros.' ownership and prior use of the HP Marks and GG Marks and related merchandise prior to commencing the conduct complained of herein.

102.   Warner Bros. is informed and believes, and on that basis alleges, that Defendants have engaged in the conduct complained of herein with the intent to compete unfairly against Warner Bros., to trade upon Warner Bros.' reputation and goodwill by causing confusion and mistake among customers and the public, and to deceive the public into believing that Defendants' infringing merchandise is associated with, sponsored by, or approved by Warner Bros., when it is not.

103.   As a result of the acts complained of herein, Defendants have caused injury to Warner Bros.' business reputation and to the reputation and goodwill surrounding the HP Marks and GG Marks, and a strong likelihood of consumer confusion as to the source of origin or relationship of Warner Bros.' and Defendants' goods, and have otherwise competed unfairly with Warner Bros.

104.   Defendants' acts complained of herein were willful and deliberate and have caused damage to Warner Bros. in an amount to be determined at trial, and such damages will continue to increase unless and until Defendants are enjoined from their wrongful actions.

105.   Defendants' acts complained of herein have caused, and will continue to cause, irreparable injury to Warner Bros.' business, substantial loss of goodwill and reputation, and pecuniary damages to Warner Bros. and consequently have caused, and will continue to cause, a substantial impact on United States commerce.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined from further violation of Warner Bros.' rights.

### **THIRD CLAIM FOR RELIEF**

### **FEDERAL TRADEMARK DILUTION – 15 U.S.C. § 1125(c)**

106.   Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

107.   By virtue of the enormous popularity of the HP Marks and GG Marks, and the massive advertising and promotion of the *Harry Potter* and *Gilmore Girls* entertainment franchises, these marks are famous among consumers and became famous long before their use by Defendants.

108.   Defendants' use of the famous HP Marks and GG Marks in their business names, websites, social media pages, and infringing merchandise has been for Defendants' own commercial gain.

109.   Defendants' use of the famous HP Marks and GG Marks in their business names, websites, social media pages, and infringing merchandise dilutes the distinctive quality of and tarnishes the public image of the HP Marks and GG Marks and is likely to cause actual dilution of the HP Marks and GG Marks, thereby impairing the HP Marks' and GG Marks' capability of identifying and distinguishing Warner Bros.', or its licensees', goods and services.

110.   Defendants' acts complained of herein were willful and deliberate and have caused damage to Warner Bros. in an amount to be determined at trial, and such damages will continue to increase unless and until Defendants are enjoined from their wrongful actions.

111.   Defendants' acts complained of herein have caused, and will continue to cause, irreparable injury to Warner Bros.' business, substantial loss of goodwill and reputation, and pecuniary damages to Warner Bros.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined from further violation of Warner Bros.' rights.

//

//

## **FOURTH CLAIM FOR RELIEF**

### **FALSE ADVERTISING – 15 U.S.C. § 1125(a)(1)(B)**

112.   Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

113.   Defendants' actions described above and specifically, without limitation, its unauthorized use of HP Marks and GG Marks, and confusingly similar variations thereof, in commerce in their business names, websites, social media pages, and infringing merchandise, and their express and/or implied representations that their infringing businesses and merchandise originated with or are associated with or endorsed or approved by Warner Bros., constitute unfair competition and false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

114.   Based on Defendant's representations and conduct in connection with their business names, websites, social media pages, and infringing merchandise, consumers are likely to be, and have been, misled and deceived into believing that Defendants' infringing businesses and merchandise originated with or are associated with or endorsed or approved by Warner Bros., when they are not.

115.   Defendants knew or should have known that their representations and conduct were false or likely to mislead consumers and the public.

116.   Defendants' acts complained of herein were willful and deliberate and have caused damage to Warner Bros. in an amount to be determined at trial, and such damages will continue to increase unless and until Defendants are enjoined from their wrongful actions.

117.   Defendants' acts complained of herein have caused, and will continue to cause, irreparable injury to Warner Bros.' business, substantial loss of goodwill and reputation, and pecuniary damages to Warner Bros.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined from further violation of Warner Bros.' rights.

**FIFTH CLAIM FOR RELIEF**

**COPYRIGHT INFRINGEMENT – 17 U.S.C. § 106, *et seq.***

118.   Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

119.   Warner Bros. is the owner of federal copyright registrations or exclusive distribution rights for each of the *Harry Potter* motion pictures and for each episode of the *Gilmore Girls* television series, as well as multiple *Harry Potter* and *Gilmore Girls* Style Guides, press kits, photographs, and other promotional materials as alleged above, which registrations are valid and subsisting.  These registrations encompass numerous distinctive visual elements from the *Harry Potter* motion pictures, such as the Hogwarts Crest and the individual Hogwarts house crests, images of the Great Hall at Hogwarts Castle, the "Deathly Hallows" symbol, and the "Platform 9 ¾" emblem, among others, as well as original visual elements from the *Gilmore Girls* television series as alleged herein.

120.   By virtue of the acts complained of herein, Defendants have directly, vicariously, and/or contributorily infringed Warner Bros.' copyrights in the *Harry Potter* films and *Gilmore Girls* television series by reproducing, distributing, displaying publicly, and creating derivative versions of numerous original visual elements from the *Harry Potter* films and *Gilmore Girls* television series, all in violation of Warner Bros.' exclusive rights under the Copyright Act, 17 U.S.C. §§ 106 and 501.

121.   All of Defendants' acts of infringement alleged herein have been performed without the permission, license, or consent of Warner Bros., and have been willful, deliberate, and purposeful, in disregard of and indifferent to Warner Bros.' exclusive rights.

122.   As a direct and proximate result of Defendants' infringement of Warner Bros.' exclusive rights under copyright law, Warner Bros. is entitled to

recover actual damages as well as Defendants' revenues in excess of allowable costs pursuant to 17 U.S.C. § 504, or in the alternative statutory damages in an amount up to $150,000 per infringed work. Warner Bros. is further entitled to recover its costs and attorneys' fees pursuant to 17 U.S.C. § 505.

123. Defendants' infringement has caused and is causing irreparable harm to Warner Bros. for which it has no adequate remedy at law. Unless this Court restrains Defendants from infringing Warner Bros.' protected works, the harm will continue to occur in the future. Accordingly, Warner Bros. is also entitled to a preliminary and permanent injunction against further copyright infringement.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**COMMON LAW UNFAIR COMPETITION (PASSING OFF)**

124. Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

125. By virtue of the acts complained of herein, Defendants have intentionally caused a likelihood of confusion among consumers and the public and have unfairly competed with Warner Bros. in violation of the common law of the State of California.

126. The purpose, tendency, and effect of Defendants' use of the HP Marks and GG Marks, in the manner alleged above, is to enable Defendants to deceive the public by passing off their businesses, products, and services as being rendered, sponsored, approved, or otherwise associated with or licensed by Warner Bros., when in fact they are not.

127. Defendants' use of the HP Marks and GG Marks in branding their businesses and in advertising and offering for sale merchandise and services is likely to cause confusion, mistake, or deception as to the source or origin of Defendants' businesses, products, and services. Said use constitutes infringement of Warner Bros.' rights with respect to the HP Marks and GG Marks.

128.    Defendants' willful acts of unfair competition have caused injury and damage to Warner Bros. in an amount to be determined at trial.

129.    Defendants' willful acts of unfair competition constitute acts of fraud, oppression, and malice.  Accordingly, Warner Bros. is entitled to punitive and/or exemplary damages pursuant to California Civil Code § 3294(a).

130.    Defendants' acts complained of herein have caused, and will continue to cause, irreparable injury to Warner Bros.' business, substantial loss of goodwill and reputation, and pecuniary damages to Warner Bros.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined from further violation of Warner Bros.' rights.

## SEVENTH CLAIM FOR RELIEF

### COMMON LAW TRADEMARK INFRINGEMENT

131.    Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

132.    Warner Bros. owns all rights, title, and interest in and to the GG Marks and the HP Marks as alleged herein, including all common law rights in such marks.

133.    Defendants acts complained of herein constitute trademark infringement in violation of the common law of the State of California.

134.    Defendants intend to continue their willfully infringing acts unless restrained by this Court.

135.    Defendants' conduct has injured Warner Bros. and will continue to cause irreparable injury to Warner Bros. for which Warner Bros. has no adequate remedy at law.  In addition, Defendants are guilty of oppression, fraud, and malice. Accordingly, Warner Bros. is entitled to punitive and/or exemplary damages pursuant to California Civil Code § 3294(a).

//

//

**EIGHTH CLAIM FOR RELIEF**

**CALIFORNIA STATUTORY UNFAIR COMPETITION**

**Cal. Business & Professions Code § 17200, *et seq.***

136.   Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

137.   By virtue of the acts complained of herein, Defendants have intentionally caused a likelihood of confusion among the public and have unfairly competed in violation of California Business and Professions Code § 17200, *et seq.*

138.   Defendants' aforementioned acts constitute unlawful, unfair, and/or fraudulent business practices, which have injured or damaged Warner Bros. including by causing a loss of money or property.  Among other violations of law, Defendants' aforementioned acts constitute trademark infringement and counterfeiting under 15 U.S.C. § 1114, false designation of origin and false advertising under 15 U.S.C. § 1125(a), trademark dilution under 15 U.S.C. § 1125(c), and false advertising under California Business and Professions Code § 17500, *et seq.*

139.   Defendants' acts complained of herein have caused, and will continue to cause, irreparable injury to Warner Bros.' business, substantial loss of goodwill and reputation, and pecuniary damages to Warner Bros.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined from further violation of Warner Bros.' rights.

**NINTH CLAIM FOR RELIEF**

**CALIFORNIA STATUTORY FALSE ADVERTISING**

**Cal. Business & Professions Code § 17500, *et seq.***

140.   Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

141.   Defendants' acts complained of herein constitute unfair competition and false advertising in violation of California Business & Professions Code

§ 17500, *et seq.*

142.   Based on the Defendants' use of the HP Marks and GG Marks in connection with their businesses, products, and services, consumers are likely to be, and have been, misled and deceived into believing that Defendants' businesses and activities are associated with, sponsored by, or approved by Warner Bros., when in fact they are not.

143.   Defendants knew or should have known that their use of the HP Marks and GG Marks in commerce was likely to mislead consumers and the public.

144.   Defendants' acts of false advertising have caused, and will continue to cause, irreparable injury, loss of reputation, and pecuniary damages.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined by this Court from further violation of Warner Bros.' rights.

<u>**TENTH CLAIM FOR RELIEF**</u>

**CALIFORNIA STATUTORY TRADEMARK DILUTION**

**Cal. Business & Professions Code § 17247, *et seq.***

145.   Warner Bros. repeats, realleges, and incorporates herein by reference every allegation contained in paragraphs 1 through 91.

146.   By virtue of the enormous popularity and worldwide recognition of the HP Marks and GG Marks, and the massive advertising and promotion of both properties, the HP Marks and GG Marks are famous among consumers.

147.    Defendants' use of the famous HP Marks and GG Marks in commerce in connection with their businesses, products, and services has been for their own commercial gain.

148.   Defendants' infringing use of the famous HP Marks and the famous GG Marks dilutes the distinctive quality of and tarnishes the public image of the Marks and is likely to cause actual dilution of the Marks, thereby impairing the Marks' capability of identifying and distinguishing Warner Bros.' or its licensees'

goods and services including the *Harry Potter* and *Gilmore Girls* properties and related merchandise.

149.   Defendants' acts complained of herein were willful and deliberate and have caused damage to Warner Bros. in an amount to be determined at trial, and such damages will continue to increase unless and until Defendants are enjoined from their wrongful actions.

150.   Defendants' willful and deliberate acts of trademark dilution have caused, and will continue to cause, irreparable injury, loss of goodwill and reputation, and pecuniary damages.  Such irreparable injury will continue unless and until Defendants are preliminarily and permanently enjoined by this Court from further violation of Warner Bros.' rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Warner Bros. prays for judgment against Defendants as follows:

A.      For a preliminary and permanent injunction, prohibiting Defendants from doing business as Hogwarts Running Club, Chilton Running Club, or Potterhead Running Club and prohibiting Defendants and each of their agents, servants, owners, shareholders, partners, employees, attorneys, assigns, and all others in privity or acting in concert with them from committing further acts of infringement or dilution, including:

1.      Using any title, name, service mark, trademark, trade name or domain name that includes or is confusingly similar to the HP Marks or the GG Marks;

2.      Using in any manner any title, service mark, trademark, trade name, domain name, trade dress, designs, colors, arrangements, collocations, or any combination thereof that imitates, resembles, or suggests or is otherwise confusingly similar to the HP Marks or the GG Marks;

3.    Otherwise infringing or diluting Warner Bros.' trademarks, service marks, trade names, or trade dress, unfairly competing with Warner Bros., or otherwise injuring Warner Bros.' business reputation in any manner;

4.    Using, registering, or reserving any domain name, Twitter name, Facebook page name or other similar domain, or social networking or media name or page that includes the HP Marks or GG Marks or is confusingly similar thereto;

5.    Using any of Warner Bros.' copyrighted elements from the *Harry Potter* films or *Gilmore Girls* television series.

B.    For an order that Defendants be directed to deliver up for destruction all merchandise, products, images, advertisements, signs, packages, publications, websites, social networking or media pages, and all other material in their possession or under their control that bear any of the HP Marks or the GG Marks, or that use the *Harry Potter* or *Gilmore Girls* distinctive titles and designs, or copyrighted images from or related to the *Harry Potter* or *Gilmore Girls* properties, pursuant to 15 U.S.C. § 1118 and 17 U.S.C. § 503.

C.    That the Court award Warner Bros. compensatory damages in an amount according to proof, and award Warner Bros. exemplary and/or punitive damages to the extent permitted by law.

D.    That the Court award actual damages for trademark infringement pursuant to 15 U.S.C. § 1117(a).

E.    That the Court award treble damages, based on the amount of actual damages proved, as permitted for trademark infringement pursuant to 15 U.S.C. § 1117.

F.    That the Court award statutory damages of up to $2 million per counterfeit mark per type of goods or services sold, pursuant to 15 U.S.C. § 1117.

G.      For an order that Defendants account to and pay over to Warner Bros. all revenues in excess of costs derived from its infringing use of the HP Marks and GG Marks, or any other use of the *Harry Potter* and *Gilmore Girls* titles and distinctive designs, elements, or images from the *Harry Potter* and *Gilmore Girls* properties, or confusingly similar variations thereof.

H.      That, pursuant to 17 U.S.C. § 504, the Court award actual damages for copyright infringement as well as all revenues in excess of allowable costs derived from Defendants' infringement of Warner Bros.' copyrights in the *Harry Potter* films and *Gilmore Girls* television series, or in the alternative that the Court award statutory damages for copyright infringement in an amount up to $150,000 per infringed work.

I.      For costs of suit, attorneys' fees, prejudgment interest, and such other and further relief as the Court deems just and proper.


Dated: March 13, 2020            JENNER & BLOCK LLP


                                 */s/ Andrew J. Thomas*
                                 Andrew J. Thomas


                                 Attorney for Plaintiff
                                 WARNER BROS. ENTERTAINMENT INC.

## <u>JURY DEMAND</u>

Plaintiff Warner Bros. respectfully requests a jury trial on all issues so triable.


Dated: March 13, 2020                    JENNER & BLOCK LLP


                                         */s/ Andrew J. Thomas*
                                          Andrew J. Thomas


                                         Attorney for Plaintiff
                                         WARNER BROS. ENTERTAINMENT INC.